**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| McKISSOCK, LLC | ) | |
| d/b/a COLIBRI GROUP | ) | |
| | ) | |
| Plaintiff, | ) | **INJUNCTIVE RELIEF REQUESTED** |
| | ) | |
| v. | ) | NO. EP-16-CV-400 |
| | ) | |
| KAREN TRACY MARTIN, | ) | |
| Serve:      6896 Granero | ) | |
| El Paso, Texas  79912 | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF McKISSOCK, LLC D/B/A COLIBRI GROUP'S**
**MOTION FOR TEMPORARY RESTRAINING ORDER**

## I.      INTRODUCTION

After nearly five years of employment with Plaintiff McKissock, LLC d/b/a Colibri Group ("McKissock" or "Company"), Defendant Karen Tracy Martin ("Martin") resigned from McKissock, refused to return Company property (including a Company laptop computer containing confidential McKissock information from the McKissock computer network), and went to work for a direct competitor of McKissock, Cannon Institute, Inc. ("Cannon").  As a condition of her employment, Martin had signed on September 1, 2011, an Employee Non-Disclosure Agreement ("Confidentiality Agreement") (Exhibit A) and the McKissock Non-Competition Terms of Agreement ("Non-Compete Agreement") (Exhibit B).

Following her resignation, and despite her contractual obligations, Martin began providing services on behalf of Cannon, a direct competitor of McKissock, in violation of the Non-Compete Agreement.  Martin refused to return Company property to McKissock, including a Company laptop with trade secrets and confidential information of McKissock, and Martin

likely utilized, and continues to utilize, such property and/or information to unfairly compete with the Company. McKissock contacted Martin demanding the return of Company property and Martin promised to return such property; however, Martin failed to do so and ignored McKissock's attempts to retrieve such property until five weeks later, after joining Cannon, and then Martin returned McKissock's computer with all data deleted.[1]   As set forth below, McKissock requires immediate judicial intervention to protect its business interests and to restrain Martin from engaging in further unlawful and malicious acts against McKissock.

## II.   DISCUSSION

McKissock requests that this Court enter a temporary restraining order.  A temporary restraining order, may be properly issued when a balancing of the following factors results in the conclusion that such relief is appropriate and equitable:

1.      A substantial likelihood of success on the merits;

2.      A substantial threat of immediate and irreparable harm for which it has no adequate remedy at law;

3.      That greater injury will result from denying the temporary restraining order than from its being granted; and

4.      That a temporary restraining order will not disserve the public interest.

*See, e.g.*, *Newby v. Enron Corp.*, 188 F. Supp. 2d 684, 707 (S.D. Tex. 2002).  The law and the evidence on each of these factors fully support the granting of the temporary restraining order requested in the instant case. Courts routinely recognize injunctive relief as an appropriate vehicle for enforcement of covenants not to compete and confidentiality agreements.  *See e.g.*, *Sirius Computer Solutions, Inc. v. Sparks*, 138 F. Supp. 3d 821, 843-844 (W.D. Tex. 2015);

---

[1] McKissock obtained a temporary restraining order against Martin in Missouri, and an extension of the temporary restraining order, before the Missouri Circuit Court granted Martin's motion to dismiss for lack of personal jurisdiction in Missouri. McKissock filed an immediate motion of appeal, but has filed the instant action, and dismissed its appeal, because of the time necessary to appeal the jurisdiction issue.

*Inter/Natl. Rental Ins. Servs., Inc. v. Albrecht,* 4:11-CV-00853, 2012 WL 642809, at *1 (E.D. Tex. Feb. 28, 2012).

**A.      McKissock Is Likely to Succeed on the Merits of its Claims.**

McKissock is likely to succeed on the merits of its claims.  Martin executed the Non-Compete and Confidentiality agreements that are designed to protect the trade secrets, confidential information and customer contacts and business relationships of McKissock. Shortly before leaving McKissock, Martin obtained substantial amounts of McKissock information that was transferred from the McKissock computer network to the Company laptop that McKissock provided to Martin for use during her employment.   Following Martin's resignation, Martin joined Cannon, a direct competitor of McKissock, in violation of the Non-Compete Agreement.  Martin, in violation of the Confidentiality Agreement, improperly retained a Company-issued laptop and other property and confidential, proprietary information despite McKissock's attempts to retrieve such property.

McKissock is likely to succeed on the merits of its claims, including its claim for preliminary and permanent injunctive relief against Martin. *See Sirius Vol. Firemen's Ins. Servs., Inc. v. CIGNA Prop. and Cas. Ins. Agency*, 693 A.2d 1330, 1338 (Pa. Super. 1997).

Courts have long enforced covenants not to compete that are reasonable in time and geographic scope to protect the former employer's customer relations or confidential information. *See, e.g., CIGNA*, 693 A.2d at 1338. Here, the two-year time frame and the nationwide geographic limitation, consistent with McKissock's national business, are reasonable and consistent with the limitations that are routinely enforced by courts; to wit, "two years is generally considered reasonable temporal limitation" in Pennsylvania. *Metro Pub. Adjustment, Inc. v. Parker*, 2134 EDA 2013, 2014 WL 10979716, at *3 (Pa. Super. Mar. 18, 2014)

(upholding a two (2) year, five (5) state restriction where the employer's business was limited to such five (5) states); *CIGNA* 693 A.2d at 1338 (upholding a three (3) year, nationwide restriction when the employer marketed its products nationally); *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 467, 475 (E.D. Pa. 2007) (upholding a worldwide restriction consistent with the employer's customer base); *Coventry First, LLC v. Ingrassia*, CIV.A.05-2802, 2005 WL 1625042, at *12 (E.D. Pa. July 11, 2005) (issuing a temporary restraining order to enforce a three year, multi-state non-compete agreement). Moreover, McKissock clearly has a protectable interest in its customer contacts and relationships and trade secrets, confidential and proprietary information.

Based on Martin's continued, knowing violations of the Non-Compete and Confidentiality Agreements, the improper retention of Company property, and the likely disclosure of proprietary information in violation of the Confidentiality Agreement, McKissock is likely to succeed on the merits of its claims against Martin, including its claim for injunctive relief.

### B.    The Threat of Irreparable Harm to McKissock Requires the Issuance of a Temporary Restraining Order.

Martin's relationship[2] with a direct competitor of McKissock, in violation of her Non-Compete Agreement, creates an immediate threat of irreparable harm.  Courts recognize that an employer will suffer irreparable harm from violation of a non-competition agreement or the use or disclosure of trade secrets.  *W. Penn Specialty MSO, Inc. v. Nolan,* 737 A.2d 295, 299 (Pa. Super. 1999) (finding that irreparable harm would result from violation of a non-compete agreement and issuing an injunction to enforce the non-compete). Additionally, the use, access, destruction or disclosure of confidential McKissock information, documents and other property

---

[2]  Discovery will demonstrate whether the relationship between Martin and Cannon is employment or a form of contracting or other arrangement.

further demonstrates the substantial threat of irreparable harm in this case. *See Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1233 (Pa. Super. 1989) (finding that the threat of disclosure of confidential information constitutes a threat of irreparable harm warranting injunctive relief); *Ecolaire, Inc. v. Crissman,* 542 F. Supp. 196, 205 (E.D. Pa. 1982) (finding that use by employee of former employer's trade secrets or confidential information is irreparable harm warranting injunctive relief).

Further, it is difficult to quantify damages suffered from such a violation.  It is also often the case that a former employee may not be capable of paying the very significant damages for the harm he or she has caused.  Here, McKissock has no adequate remedy at law because of the difficulty quantifying damages related to diminished customer relations and referral sources, the unauthorized disclosure of proprietary information, and other harm suffered as a result of Martin's conduct.  It would also be difficult to quantify the damages of disclosure of trade secrets and confidential information and to determine the costs to enable McKissock to recoup the competitive advantage that will be lost if Martin is permitted to continue her wrongful conduct. *Nolan*, 737 A.2d at 299 (Upholding an injunction to enforce a non-compete after finding, "[b]ecause the potential extent of the resulting drain on MCC's patient base cannot be estimated with any degree of certainty, it clearly would pose a source of injury not calculable by an 'accurate pecuniary standard.'").

The potential for irreparable harm and difficulty in ascertainment of actual damages warrant injunctive relief in this case.

### C.     The Balance of Harm Supports Entry of a Temporary Restraining Order.

If a temporary restraining order is not entered, McKissock would be subject to further misuse and misappropriation of its confidential, proprietary business information, as well as unfair competition by Cannon and Martin—all of which violates the Confidentiality Agreement

5

and Non-Compete Agreement.  Such potential use and misappropriation subjects McKissock to additional and even greater risks of unfair competition by Martin, all to the detriment of McKissock and its customer and referral relationships. *See Barber's Chem., Inc. v. Earnhardt,* 786 WDA 2013, 2014 WL 10965138, at *9 (Pa. Super. Mar. 28, 2014) (upholding an injunction to enforce a restrictive covenant to protect employer's confidential business information after balancing such interest with former employee's right to work, the public's right to unrestrained competition and the right to contract, when former employee attempted to use employer's confidential business information in a competing business).

The balance of harm factor weighs heavily in favor of issuing the temporary restraining order requested by McKissock.

### D. The Public Interest Supports Entry of a Temporary Restraining Order.

Considerations of public interest also weigh heavily in favor of granting the requested relief.  The harm to McKissock resulting from the loss of its customers, referral sources, goodwill, and proprietary information cannot be adequately measured in dollars alone.  There is also a substantial loss in terms of expenditure of time, money and effort in the development of customer relations and trade secrets.  Martin is unfairly attempting to deprive McKissock of these protectable interests in violation of contracts to which she agreed.  There is a significant societal interest in honoring contracts and in safeguarding businesses from unfair competitive practices.  An injunction is the appropriate means to protect the legitimate interests of the public under these circumstances and to preserve and foster fair business practices.

## III. CONCLUSION

For all the foregoing reasons, Plaintiff McKissock, LLC d/b/a Colibri Group respectfully requests that its Motion for Temporary Restraining Order be granted.

Respectfully submitted,

**LEWIS RICE LLC**

By: ____/s/  Charlse C. High, Jr._____
      Charles C. High, Jr., # 09605000
      221 N. Kansas
      Suite 1700
      El Paso, TX  79901
      E-mail:  charles.high@kempsmith.com

Attorneys for Plaintiff McKissock, LLC
 d/b/a Colibri Group

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing ***MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF McKISSOCK, LLC D/B/A COLIBRI GROUP'S MOTION FOR TEMPORARY RESTRAINING ORDER*** will be served by delivering same to Process Server, LJ & Associates, 609 Myrtle, El Paso, Texas, 79901, on the 2d day of September, 2016 to be served along with the Summons and Verified Amended Petition in this lawsuit on Defendant in this action.

/s/ Charles C. High, Jr.

Charles C. High, Jr.

## EMPLOYEE NON-DISCLOSURE AGREEMENT

FOR GOOD CONSIDERATION, and in consideration of being employed by McKissock LP, the undersigned employee hereby agrees and acknowledges:

1. That during the course of my employ there may be disclosed to me certain trade secrets of the Company; said trade secrets consisting of but not necessarily limited to:

> (a) Technical information: Methods, processes, formulae, compositions, systems, techniques, inventions, machines, computer programs and research projects.

> (b) Business information: Customer lists, pricing data, sources of supply, financial and marketing data, course design development or merchandising systems or plans.

2. I agree that I shall not disclose or divulge to others including future employers, any trade secrets, confidential information, or any other proprietary data of the Company in violation of this agreement, whether during my employment with the company or after termination of said employment.

3. That upon the termination of my employment from the Company:

> (a) I shall return to the Company all documents and property of the Company, including but not necessarily limited to: drawings, blueprints, reports, manuals, correspondence, customer lists, computer programs, and all other materials and all copies thereof relating in any way to the Company's business, or in any way obtained by me during the course of employ. I further agree that I shall not retain copies, notes or abstracts of the foregoing.

> (b) The Company may notify any future or prospective employer or third party of the existence of this agreement, and shall be entitled to full injunctive relief for any breach.

> (c) This agreement shall be binding upon me and my personal representatives and successors in interest, and shall inure to the benefit of the Company, its successors and assigns.

Signed this ___1st__ day of ___September_____, 2011____.

_____          _____
For McKissock,LP                            Employee Signature

Exhibit

A

## McKissock Non-Competition Terms of Agreement

In recognition and consideration of employment by McKissock, L.P., the employee hereby agrees and covenants that he or she will not, during a period of two (2) years immediately following his or her termination of employment with Employer, either directly or indirectly, own, manage, operate, control, be employed or retained by, participate in or be connected in any manner with any business or practice which is in competition with Employer located within the customer base which is acknowledged to be nationwide.  The geographical restriction just listed is specifically agreed to between the parties and is an acknowledgement of the nationwide nature of Employer's business.  Employee also agrees that for a period of two (2) years immediately following his or her termination, he or she will not directly or indirectly engage in competition with Employer.  Further, Employee acknowledges that this Agreement not to exploit for his or her own benefit customer relationships developed as an employee is reasonable and has been freely and willingly made.

In the event that any Court of competent jurisdiction determines that any other restrictive covenants contained in this document are inequitably broad, it is the intention of the parties that the Court adjust the obligations of Employee under the restrictive covenants rather than eliminating such obligations entirely.  Specifically, in the event that a Court shall equitably adjust the restrictive covenants contained herein as to non-competition, the remainder of the Agreement shall remain in full force and effect.

### *GENERAL CONTRACT TERMS:*

Employee acknowledges that any breach of any obligation contained in this Agreement is not adequately compensable by money damages, and Employee agrees that any such cause Employer irreparable injury for which Employer shall be entitled to a preliminary injunction and temporary restraining order.

This Agreement embodies the entire understanding of the parties.  No amendment or modification of this Agreement shall be valid or binding upon Employer unless made in writing and signed by a duly authorized officer of Employer or upon the Employee unless made in writing and signed by him or her.

This Agreement shall be construed and the legal relations between the parties determined in accordance with the laws of Pennsylvania.

Signed this __1st___ day of ___September_____ 2011____.

Full Name (Print):__Karen Tracy Martin_____

Signature: _____

Exhibit

B

Gary M. Smith

gsmith@lewisrice.com
314.444.7623 *(direct)*
314.612.7623 *(fax)*

# LEWISRICE LLC

Attorneys at Law

600 Washington Avenue
Suite 2500
St. Louis, Missouri 63101
www.lewisrice.com

June 27, 2016

VIA FEDERAL EXPRESS AND REGULAR MAIL

Karen Tracy Martin
6896 Granero
El Paso, TX 79912

Re:   **Non-Compete and Non-Disclosure Obligations**

Dear Ms. Martin:

I represent your former employer, McKissock, with regard to the Non-Competition agreement ("Agreement") you signed on September 1, 2011. You agreed to various obligations and restrictive covenants in consideration of your employment, including, but not limited to, the following:

> In recognition and consideration of employment by McKissock, L.P., the employee hereby agrees and covenants that he or she will not, during a period of two (2) years immediately following his or her termination of employment with Employer, either directly or indirectly, own, manage, operate, control, be employed or retained by, participate in or be connection in any manner with any business or practice which is in competition with Employer located within the customer base which is acknowledged to be nationwide. The geographical restriction just listed is specifically agreed to between the parties and is an acknowledgements of the nationwide nature of Employer's business. Employee also agrees that for a period of two (2) years immediately following his or her termination, he or she will not directly or indirectly engage in competition with Employer.

Mr. Chris Elliott, Vice-President of Human Resources, reminded you of these obligations when you resigned your employment but it appears you have ignored or incorrectly attempted to side-step that warning. McKissock has become aware that you have accepted employment or a contracting or consultant arrangement with Cannon in direct competition with McKissock and in violation of your promises in the Agreement. In addition, you have wrongfully kept property of your former employer and, while promising that you would return the property last week, you did not do so. You must immediately return all such property (and all copies, digital or otherwise, of same).

*Established 1909*

2171508.1

**Exhibit**

**C**

LEWISRICE LLC

June 27, 2016
Page 2

The purpose of this letter is to provide you an opportunity to address this situation prior to further escalation of the matter.  In addition to the immediate return of company property, McKissock requires that you immediately cease and refrain from breach of the Agreement and that you fully comply with all obligations of the Agreement.  If you do not provide McKissock an unequivocal statement, on or before Friday, July 1, 2016, that you will fully honor the Agreement and that you will completely cease your relationship with Cannon or any entity in competition with McKissock, McKissock may pursue legal action against you, without further notice or warning. Notwithstanding the foregoing, nothing herein waives or is intended to waive McKissock's rights to pursue legal action against you for any prior or subsequent breach of the Agreement. In addition, unless remedied to the satisfaction of McKissock as provided herein, McKissock will also take such actions as it deems necessary against Cannon and Mr. H. Charles Johnson, Mr. Jeremy Johnson, and Mr. Robert Oglesby to prevent tortious interference with the contractual and business expectations of McKissock.  Likewise, you may not provide services to other persons or entities in violation of your Agreement that benefit Cannon or other persons or entities.

You, Cannon, Mr. H. Charles Johnson, Mr. Jeremy Johnson and Mr. Robert Oglesby, are hereby on notice of reasonably anticipated litigation and are each reminded of your obligation to retain and not destroy, and not allow to be destroyed (intentionally, by inaction or otherwise), any documents or communications, electronic or otherwise, pertaining to this dispute. McKissock reserves and does not waive any claims or rights, in law and equity, and may proceed against one or more of you without further notice.

This is a serious matter and I strongly urge you not to ignore this effort by McKissock to avoid further escalation of this matter. I look forward to your correspondence that you have ceased your activities in violation of the Agreement and your intention to fully comply with the Agreement.

Very truly yours,

Gary M. Smith

GMS/s

cc:    Mr. H. Charles Johnson (via Federal Express and regular mail)
       Mr. Jeremy Johnson (via Federal Express and regular mail)
       Mr. Robert Oglesby (via Federal Express and regular mail)

# OWNERSHIP OF WORK PRODUCT
## AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into as of the 2 day of July, 2014 (the "Effective Date"), by and between TRACY MARTIN, an individual residing in the State of TEXAS ("Employee") and MCKISSOCK HOLDINGS, LLC, a Delaware limited liability company (the "Company").

## RECITALS

WHEREAS, the Company provides, directly and through its subsidiaries, classroom and online continuing education courses for professionals in many industries (collectively, the "Business");

WHEREAS, Employee has provided various services related to the Business for the Company and its predecessors in interest;

WHEREAS, QC McKissock Investment, LLC, a Delaware limited liability company, purchased a majority of the equity interests in the Company "the "QC Purchase");

WHEREAS, Employee is employed by the Company to provide certain services related to the Business and such services may include the creation of software, know-how and other deliverables for the Company; and

WHEREAS, Employee desires to give, and Company desires to receive from Employee, a covenant that all Work Product (as defined below) is considered work made for hire and solely owned by Company.

NOW THEREFORE, in consideration of the premises and mutual covenants and agreements hereinafter set forth and the continued employment of the Employee, the receipt and sufficiency of which are hereby acknowledged, the parties hereto mutually covenant and agree as follows:

Section 1.   **Employment.** The employment of Employee with the Company will continue on the same basis as prior to the QC Purchase.

Section 2.   **Ownership of Work Product.**

2.1   Ownership of Work Product.

(a)   Employee agrees that the Company is the sole owner of all Work Product (as defined below). All Work Product that is a work of authorship is deemed to be a "work made for hire" by Employee and owned solely by the Company. For purposes of this Agreement, "**Work Product**" means, without limitation, all intellectual property rights, including all trade secrets, copyrights (and all works of authorship), patents, inventions (whether or not patentable), ideas, designs, techniques, discoveries and improvements, including any and all rights in any documentation, software, source code, technology, systems, prototypes, drawings, artwork or other materials or deliverables that

I

Exhibit

D

relate to the Company or the Company's predecessors in interest or past, current or future Business, including materials that Employee conceives, develops, reduces to practice while employed by or while otherwise performing work for the Company or the Company's predecessors in interest, whether alone or in cooperation with others, whether or not during regular working hours, which are suggested by or result from any work performed by Employee in connection with the Business, based on information received by Employee from the Company, or otherwise related to the Business, even if conceived or developed before the date of this Agreement together with anything delivered to the Company or to its predecessors in interest and all intellectual property rights thereto, including any modifications, enhancements or improvements to any or the foregoing.

(b)     If any of the Work Product is not, by operation of law, considered "work made for hire", or if ownership of any right, title and interest in and to the Work Product does not otherwise fully vest in the Company, Employee hereby assigns to the Company now and upon creation of any future Work Product, without further consideration, all right, title and interest in the Work Product, including, without limitation, the right to claim priority rights deriving from any of the foregoing and the right to sue for, settle and release past, present and future infringement of any of the foregoing. Employee hereby irrevocably waives any rights that cannot be assigned by law with respect to the Work Product.

(c)     The Company has the right to obtain and hold in its own name copyright, trademark or patent registrations and any other right, title, interest or protection in the Work Product.

(d)     Employee will fully and promptly disclose to the Company all Work Product which is developed, created, enhanced, modified or improved in connection with the Employee's employment with the Company or Employee's performance of services for the Company. Further, Employee will provide the Company with all the assistance it reasonably requires to perfect, protect and use its right to the Work Product, Domain Names (defined below), Social Media Sites (defined below) and Rights of Publicity (defined below), and sign all such documents, take all actions and supply information that the Company considers necessary or desirable to transfer, and record the transfer of, the Work Product, Domain Names, Social Media Sites and Rights of Publicity to the Company, and to enable the Company to obtain exclusive patent, copyright, or other legal protection. Employee agrees not to infringe on any intellectual property rights, copyright, trademark, service mark, or patent now held, or hereafter acquired, by the Company or its successors and assigns. Without limiting the foregoing, Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents, as Employee's agent and attorney-in-fact to act for and on its behalf and instead of Employee, to execute and file any documents, applications or related filings and to do all other lawfully permitted acts in furtherance of the purposes set forth in this paragraph, including the perfection of assignment of any rights in connection with the Work Product, Rights of Publicity, Domain Names and Social Media Sites with the same legal force and effect as if executed by Employee.

2.2     Further Acts. Employee agrees to perform, upon the reasonable request of the Company, during or after his or her employment therewith, such further acts as may be necessary or desirable to transfer, perfect and defend the Company's ownership of the Work Product. Not limiting the foregoing, Employee will: (a) provide Company with the user name and passwords for any social media pages, accounts, and content therein related to the Business or the Company, including but not limited the social media sites listed on Exhibit B (collectively, "Social Media Sites"); (b) promptly provide transfer authorization codes for any domain names, uniform resource

2

locators and other names and locators associated with the Internet, including applications and registrations thereof, including but not limited to the domain names listed on Exhibit B (collectively, "Domain Names"), unlock the Domain Names, and approve any transfer requests for the Domain Names that the company provides to the Employee; (c) maintain the Domain Names and Social Media Sites until such time as all the foregoing are fully transferred to and in the possession of the Company; (d) promptly and properly complete and submit to the registrar for each of the Domain Names, any and all instructions necessary to transfer ownership as registrant of the Domain Names to the Company or any entity designated by the Company; and (e) deliver all tangible embodiments of any Work Product in Employee's possession or control, including without limitation, all existing documentation and information that relates to the Work Product.  The Company will reimburse all reasonable out-of-pocket expenses incurred by Employee at the Company's request including (unless employee is otherwise being compensated by the Company at such time).

2.3    Disclosure.  Employee will disclose promptly to the Company any and all Work Product upon the creation of such.

2.4    Unrelated Works.  All inventions made by Employee both prior to employment with the Company or its predecessors in interest and that are unrelated to the Business (the "Unrelated Works") are excluded from the scope of this Agreement.  To preclude any possible uncertainty, Employee has set forth in Exhibit A to this Agreement a complete list of all of his or her Unrelated Works, including numbers of all patents and patent applications, and a brief description of all on patented inventions that are not the property of the previous employer.  Employee represents and covenants that the list is complete and, if no items are on the list, Employee has no Unrelated Works.  If the Work Product includes Unrelated Works, Employee hereby assigns all right, title and interest in the Unrelated Works to the Company, including, without limitation, the right to claim priority rights deriving from any of the foregoing and the right to sue for, settle and release past, present and future infringement of any of the foregoing.  Employee hereby irrevocably waives any rights that cannot be assigned by law with respect to such Unrelated Works.

2.5    Rights of Publicity Assignment.  Employee hereby assigns to the Company all right, title and interest in and to the Employee's Rights of Publicity (defined below) with respect to the Business and the field in which the Business operates. For the purposes of clarity and without limiting the foregoing, the Employee hereby assigns to Company all rights necessary to exercise or exploit the Rights of Publicity, including without limitation, the right to use, display, transmit, distribute and otherwise exploit Employee's Rights of Publicity in connection with the products, services and Business of the Company including, but not limited to, in any related advertising, promotional, informational and other materials.  Not limiting the foregoing assignment of rights, Company may directly and indirectly license, authorize the grant of sublicenses and/or assign the Rights of Publicity to others. Employee will cooperate with the Company's exercise of the assigned rights, including without limitation, providing images, recordings or other identifications as requested by the Company, from time to time, and Employee will cooperate with the Company's recordation of any Rights of Publicity, including without limitation, by photograph, digital recording, or any other electronic method of recordation.  "Rights of Publicity" means Employee's name, voice, nickname, likeness, image, and anything else that identifies Employee, including, without limitation, audio, video, photographic, graphic or other representations of Employee, Employee's signature, and statements by Employee alone or with other trademarks.  Employee hereby irrevocably waives: (a) any rights that cannot be assigned by law with respect to the Rights

3

of Publicity and the Company's exercise of those rights; (b) any right to inspect and/or approve any materials wherein the Rights of Publicity appear; and (c) any right to compensation related to the assignment of Rights of Publicity provided herein, other than as specified in Section 1 of this Agreement. Employee irrevocably releases in perpetuity the Company and its predecessors in interest, its designees and its successor, assigns and/or licensees from any claims, liabilities or damages arising from or relating to any use, infringement, or violation of any personal or propriety right Employee may have in connection with Employee's Rights of Publicity.

2.6    Irrevocable and Binding Assignment.    Employee does not have the right to: (a) rescind any of the rights or waivers granted herein; (b) enjoin, restrain or otherwise hinder the Company's exercise of any of the rights granted herein; or (c) enjoin, restrain or otherwise hinder, by court order or otherwise, the manufacture, use, sale, offer for sale, importation, marketing, license, translation, copying, duplication, recording, broadcasting, distribution, performance, display, addition to, subtraction from, arrangement, rearrangement, revision, modification, change, adaptation or other exploitation of the Work Product or Rights of Publicity.

Section 3.    Acknowledgements.    Employee hereby acknowledges and agrees: (a) Employee has not entered into any employment agreement, confidentiality agreement, non-competition agreement, non-solicitation agreement or similar type of agreement with a former employer or another third party that precludes Employee from entering this Agreement; and (b) Employee will not (and has not) use the confidential information of his or her former employer or any other third party in violation of such party's rights in connection with Employee's employment with the Company, and Employee will not disclose to the Company, or cause the Company to use, any confidential information or materials belonging to any previous employer of Employee or any other third party.  This Section 4 survives the termination of Employee's employment with the Company, and is binding Employee's heirs, legal representatives, and assigns.

Section 4.    Remedies.    Employee acknowledges that a violation of the terms of this Agreement will cause damage and harm to the Company, including, but not limited to, loss of competitive advantage, loss of revenue, increase in costs and other harm not yet ascertainable to the Company.  Employee acknowledges that any such damages set forth above will be difficult if not impossible to calculate in monetary terms and will be irreparable to the Company.  Employee agrees that in the event of a breach of this Agreement, the Company may seek equitable relief, including any affirmative restraining order, with or without notice, any preliminary injunction and/or permanent order to enjoin any further violations of this Agreement, in addition to any prayer for monetary relief for damages suffered by the Company.  Employee expressly waives the defense that a remedy in damages will be adequate and any requirement in an action for specific performance or injunction for the posting of a bond by the Company.  Employee agrees that upon written notice from the Company declaring a breach of this Agreement, Employee will immediately cease all further activities, which are, or are claimed by the Company to be, a breach of this Agreement.  Employee agrees to pay all costs incurred by the Company in connection with the enforcement of this Agreement, including reasonable attorney's fees and disbursements.

Section 5.    Entire Agreement.    This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof.

Section 6.    Amendment; Waiver.    The terms, provisions, and conditions of this Agreement may not be changed, supplemented or amended in any manner except by an instrument

4

in writing duly executed by all of the parties and identified as an amendment hereto. Any failure by any party to this Agreement to comply with any obligation, covenant, agreement, or condition contained herein may be expressly waived in writing by the other parties hereto, but such waiver or failure to insist upon strict compliance will not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

Section 7.     Assignability.  This Agreement is binding and inures to the benefit of the Company, its successors and assigns, by operation of law or otherwise, including without limitation any entity into which the Company, or any of its successors or assigns, is merged or with which it, or any of its successors or assigns, is consolidated. The rights and obligations of the Employee hereunder are not assignable, nor may any duties of the Employee hereunder be delegated without the prior written consent of the Company.

Section 8.     Severability.  If any provision of this Agreement is found by a court of competent jurisdiction to be unenforceable or invalid, such unenforceability or invalidity will not render this Agreement unenforceable or invalid as a whole. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

Section 9.     Notices.  All notices and other communications hereunder will be in writing, will be addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder, and will be either (a) delivered by hand, (b) made by facsimile transmission or electronic mail with a copy by first class mail, (c) sent by recognized overnight courier, or (d) sent by certified mail, return receipt requested, postage prepaid:

Employee:

Tracy Martin
6896 CRANBERY
EL PASO TX 79918

Company:

McKissock Holdings, LLC
218 Liberty Street
Warren, Pennsylvania 16365
Attention: Michael Duran

All notices and other communications hereunder will be deemed to have been received (i) if delivered by hand, at the time of the delivery thereof to the receiving party, (ii) if sent by facsimile transmission or electronic mail, at the time receipt has been acknowledged by electronic confirmation or otherwise, (iii) if sent by overnight courier, on the next business day following the day such notice is delivered to the courier service, and (iv) if sent by certified mail, on the third business day following the day such mailing is made.

Section 10.   **Headings.**   The headings contained in this Agreement are inserted for convenience only and will not constitute a part hereof or control or affect the meaning or construction of any of the provisions hereof.

Section 11.   **Governing Law.**   This Agreement will be controlled, construed and enforced under the laws of the State of Delaware without regard to the principles governing conflicts of laws.

Section 12.   **Counterparts.**   This Agreement may be executed in any number of counterparts, each of which is considered an original, and such counterparts will, together, constitute and be one and the same instrument.

*[Signature Page Follows]*

6

IN WITNESS WHEREOF, the parties have executed this Agreement, or have caused this Agreement to be executed by their respective duly authorized representatives, as of the Effective Date.

**EMPLOYEE**

Print Name: Tracy Martin

**COMPANY**

McKissock Holdings, LLC

By: 
Name: ASHLEY NORTHCUT
Title: CURRICULUM & REGULATORY PROJECT MANAGER

7

**EXHIBIT A**
**UNRELATED WORKS**

None unless completed.

**EMPLOYEE**

Print Name: TRACY MARTIN

**COMPANY**

By:
Name:
Its: Manager

8

**EXHIBIT B**

<u>Domain Names</u>:

9