# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| McKISSOCK, LLC, d/b/a/ | § | |
| COLIBRI GROUP, | § | |
|     Plaintiff, | § | |
| | § | EP-16-CV-400-PRM |
| v. | § | |
| | § | |
| KAREN TRACY MARTIN, | § | |
|     Defendant. | § | |

## ORDER GRANTING PRELIMINARY INJUNCTION

On this day, the Court considered Plaintiff McKissock, LLC's, "Verified Complaint . . . for Temporary Restraining Order, Preliminary and Permanent Injunctive Relief and for Damages Against Defendant Karen Tracy Martin" (ECF No. 1) [hereinafter "Verified Complaint"], filed on September 2, 2016; Defendant Karen Tracy Martin's "Answer and Counterclaim" (ECF No. 14) [hereinafter "Answer"], filed on September 16, 2016; Defendant's "Response in Opposition to Plaintiff's Application for Preliminary Injunction" (ECF No. 15) [hereinafter "Response"]; and the testimony and evidence the parties presented to the Court during the preliminary injunction hearing held on September 19, 2016. After due consideration, the Court is of the opinion that the preliminary injunction should be granted for the reasons that follow.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff McKissock is a Missouri-based company that provides continuing education courses to real estate professionals, such as appraisers, real estate brokers and agents, home inspectors, and land surveyors nationwide.  Verified Compl. 3; Answer 3.

McKissock contracted the services of Defendant Martin, a real estate appraisal instructor, from 2002 to 2011.  Resp. 8.  Martin testified that she earned approximately $32,000 annually as an independent contractor, providing services to McKissock as well as other companies who similarly provide continuing education courses to individuals in the insurance-appraisal industry.  Am. Tr. 52, Oct. 7, 2016, ECF No. 28 [hereinafter "Amended Transcript"].

On September 1, 2011, the nature of Martin's relationship with McKissock changed:  she became a salaried employee, and her official title became "Senior Appraisal Instructor and Curriculum Advisor."  Verified Compl. 1–2; Resp. 9.  As a result, Martin received higher pay, at a salary rate of $58,000 annually, and health insurance benefits.  Am. Tr. 100–01.

On that same date, September 1, 2011, Martin also signed three agreements: (1) "McKissock Non-Competition Terms of Agreement," Verified Compl. Ex. B [hereinafter "Non-Compete Agreement"]; (2) "Employee Nondisclosure Agreement," *id.* at Ex. A [hereinafter "Confidentiality Agreement]; and (3) "Ownership of Work Product Agreement," *id.* at Ex. D [hereinafter Work-Product Agreement].

The Non-Compete Agreement forbids Martin from competing against McKissock either directly or indirectly for a period of two years following her termination of employment; the restriction is nationwide.[1]

The Confidentiality Agreement prohibits Martin from disclosing McKissock's trade secrets, confidential or proprietary data, such as technical information (e.g., methods, processes, formulae, compositions, techniques, inventions, computer programs, research projects), or

---

[1] The Non-Compete Agreement states: "In recognition and consideration of employment by McKissock, L.P., the employee hereby agrees and covenants that he or she will not during a period of two (2) years immediately following his or her termination of employment with Employer, either directly or indirectly, own manage, operate, control, be employed or retained by, participate in or be connected in any manner with any business or practice which is in competition with Employer located within the customer base which is acknowledged to be nationwide. The geographical restriction is specifically agreed to between the parties and is an acknowledgement of the nationwide nature of the Employer's business." Non-Compete Agreement 1.

business information (e.g., customer lists, pricing data, sources of supply). Confidentiality Agreement 1. The Confidentiality Agreement also requires Martin to return all company documents and property. *Id.*

Finally, the Work-Product Agreement provides that McKissock is the sole owner of all work product—or "work made for hire." Work-Product Agreement 1–2.

McKissock provided Martin with company property to assist her in performing her duties for the company, including a laptop computer, computer software, a printer, a company credit card, and a projector. Verified Compl. 7; Answer 4.

Five years later, Martin ceased her employment with McKissock, though the circumstances surrounding the termination of her employment are unclear. Martin testified that McKissock terminated her, while McKissock maintains that Martin resigned. *See* Am. Tr. 79. Martin testified that Tom Davidson, her direct supervisor, told her she "was being fired" on May 6, 2016, because of company budget cuts. *Id.* at 91. According to Martin, McKissock offered her the opportunity to continue to provide services as an independent contractor once again, but she declined. *Id.* Martin requested that her last day of employment

with McKissock be May 31, 2016, however, the paperwork was not submitted timely.[2] Pl.'s Ex. 21.[3] As a result, her official last day of employment occurred on June 10, 2016. *Id.*

Martin testified that she began providing services for Cannon Institute Inc. ("Cannon"), a competitor of McKissock, on June 1, 2016—"working under the impression that her last day [of employment] was May 31, 2016." *See id.*; Am. Tr. 95. Cannon is a relatively new company that also provides continuing education courses for real estate professionals, with a focus in Arizona and Utah. *See* Am. Tr. 88; Resp. 9–10. Jeremy Johnson, one of Martin's colleagues at McKissock, who is also a real estate appraisal instructor, helped establish Cannon. Am. Tr. 99–100. Johnson had previously provided services to McKissock as an independent contractor. *Id.* at 76. While Martin was employed by McKissock and bound by the Non-Compete Agreement, she and Johnson had discussed the possibility of Martin assisting with Cannon's development. *See* Pl.'s Ex. 10. In one email correspondence between

---

[2] The parties do not indicate who was responsible for the delay in the submission of the paperwork.

[3] All of Plaintiff's exhibits are contained in ECF Document Number 17 filed on September 20, 2016.

Martin and Johnson, Martin suggested that they should both "grow Cannon to the point that is a SERIOUS threat to McKissock." *Id.*

To prove that Martin resigned, McKissock introduced an email that Martin sent to Johnson stating that she was "going to be resigning as an employee of McKissock and doing contract work for them." Pl.'s Ex. 15. This email also provides that "[t]here are a number of reasons behind [Martin's] decision, including being able to work with [Johnson] without being unethical." *Id.* Martin conceded that she did write this email but explained that she had only indicated she was resigning because she was "embarrassed" to inform Johnson that she had actually been terminated. Am. Tr. 97.

After Martin's last day of employment, she promptly returned all of the McKissock property that she had been issued except for a Dell laptop computer. Verified Compl. 2; Resp. 10; Am. Tr. 103–04. Martin eventually returned the computer over a month later, after reformatting the computer's hard drive and deleting all information contained in the laptop. Am. Tr. 109–10. Significantly, Martin possessed McKissock's company laptop when she began working for Cannon.

McKissock thereafter filed its Verified Complaint in early September, wherein it sought preliminary and permanent injunctive relief to enforce the Non-Compete Agreement, the Confidentiality Agreement, and the Work-Product Agreement. Verified Compl. McKissock also filed a "Motion for Temporary Restraining Order" (ECF No. 3) on September 2, 2016, which the Court granted on September 6, 2016. *See* TRO 1–3 (ECF No. 6).

## II. LEGAL STANDARD

"A preliminary injunction is an 'extraordinary remedy' that should not be granted unless its proponent clearly shows: (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

McKissock primarily seeks to enforce the Non-Compete Agreement. Verified Compl. 10. It requests that the Court enjoin Martin from breaching the Non-Compete Agreement and order her to cease her relationship with Cannon during the two-year restriction period provided in the Non-Compete Agreement. *Id.*

#### 1. Choice-of-Law Provision

In assessing McKissock's likelihood of success on the merits, the Court must first determine which law applies to the parties' Non-Compete Agreement. The Non-Compete Agreement contains a choice-of-law provision, which provides that Pennsylvania law should govern. Neither of the parties contests the choice-of-law provision—both would prefer that the Court enforce it. Am. Tr. 14–15; Resp. 11. Nevertheless, given that McKissock is a nationwide company currently based in Missouri, given that Martin is a Texas resident who worked primarily from her home in Texas, and given the lack of any apparent connection between Pennsylvania and the present dispute, the Court will analyze whether the choice-of-law provision is enforceable. *See Cardoni v.*

*Prosperity Bank*, 805 F.3d 573 (5th Cir. 2015) ("Contractual choice-of-law provisions are not so unassailable . . . [they] dictate the law that will decide the dispute, and thus create more tension with a state's power to regulate conduct within its borders."); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990) ("However, the parties' freedom to choose what jurisdiction's laws will apply to their agreement cannot be unlimited. They cannot require that their contract be governed by the law of a jurisdiction which has no relation whatever to them or their agreement. And they cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply.").

"In making a choice of law determination, a federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state, here Texas." *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "Texas law recognizes the 'party autonomy rule' that parties can agree to be governed by the law of another state." *Exxon Mobil Corp. v. Drennen, III*, 452 S.W.3d 319, 324 (Tex. 2014); *cf.* Tex. Bus. & Com. Code § 1.301 (a) ("[W]hen a transaction bears a reasonable relation to this state and also to another state or nation[,]

the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties."). Thus, "[i]n Texas, contractual choice-of-law provisions are ordinarily enforced if the chosen forum has a substantial relationship to the parties and the transaction." *Access Telecom, Inc., v MCI Telecomm. Corp.*, 197 F.3d 694, 705 (5th Cir. 1999). In sum, the default in Texas is that choice-of-law provisions are enforceable, but it is not uncommon for them to be defeated. *See Cardoni*, 805 F.3d 573, 581 (5th Cir. 2015).

The Texas Supreme Court has adopted the Restatement of Conflict of Laws Section 187's framework for determining whether the parties' choice-of-law agreement is enforceable. *Drennen*, 452 S.W.3d at 325 (citing Restatement (Second) of Conflict of Laws § 187 (2)). The Restatement provides the following:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either
>
>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>>
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under

the rule of § 188, would be the state of applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2).

Thus, the Court must determine whether either § 187(2)(a) or § 187(2)(b) renders the parties' choice-of-law provision unenforceable.

### a.    *Section 187(2)(a)*

Section 187(2)(a) provides that the parties' choice of law will not be enforced if the state does not have a substantial relationship to the parties or transaction and there is no reasonable basis for the parties' choice. The Restatement does not define "substantial relationship," and the Fifth Circuit has not defined the term either. *See Drennen*, 452 S.W.3d at 325. However, "[e]ven when a relationship is not substantial, the parties may be held to the chosen state's law [under § 187(2)(a)] when they had a reasonable basis for their choice, such as choosing law they know well or that is well developed." *See id.* (citing Restatement (Second) § 187 cmt. f).

Here, while the relationship between Pennsylvania, the parties, and the transaction is arguably not substantial, McKissock was formerly headquartered in Pennsylvania. Am. Tr. 134. Accordingly,

the parties did have a reasonable basis for choosing Pennsylvania law,
and § 187(2)(a) of the Restatement does not preclude application of
Pennsylvania law. *See id.*; *see also Cardoni*, 805 F.3d at 581 ("The first
subsection, 187(2)(a), does not help the [opponents of the choice-of-law
provision]. The parties had a reasonable basis for agreeing that Texas
law would apply given that [the defendant] is headquartered in the
state.").

> b. *Section 187(2)(b)*

Yet, pursuant to § 187(2)(b), even if there is a "reasonable basis"
for choosing a state's law to govern a transaction, the choice of law
should not be enforced where another state:

> (1) has a more signification relationship with the parties and
> the transaction at issue than the chosen state does under
> Restatement § 188;
>
> (2) has a materially greater interest than the chosen state
> does in the enforceability of a given provision; and
>
> (3) has a fundamental policy that would be contravened by
> application of the chosen state's law.

*Cardoni*, 805 F.3d at 582 (citing *Drennen*, 452 S.W.3d at 325–27).[4]

---

[4] "Texas takes the Section 187(2)(b) factors in reverse order." *Drennan*,
452 S.W.3d at 325.

Therefore, the Court must next determine, pursuant to this "three-step approach," which the Texas Supreme Court has adopted, whether the parties choice-of-law provision is enforceable pursuant to § 187(2)(b) of the Restatement. *See Drennan*, 452 S.W.3d at 325; *see also DeSantis*, 793 S.W.2d at 678.

### i. Most Significant Relationship

"The first determination of Restatement section 187(2)(b) is 'whether there is a state law which would apply under section 188 of the Restatement absent an effective choice of law by the parties.'" *Drennen*, 452 S.W.3d at 325 (quoting *DeSantis*, 793 S.W.2d at 678). Section 188 of the restatement states that the contacts to be taken into account to determine the applicable law include: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the parties' domicile, residence, nationality, place of incorporation and place of business. § 188(2). "This inquiry evaluates whether a state has a more significant relationship with the parties and their transaction than the state they chose." *Drennen*, 452 S.W.3d at 325–26 (internal quotation

marks and citation omitted).  "These contacts are weighed not be their number, but by their quality."  *Cardoni*, 805 F.3d at 582–83.

Weighing all of the relevant factors in the present case, the Court concludes that Texas has a more significant relationship to the parties and the transaction than does Pennsylvania.  While the place of contracting and negotiation remains unclear from the record, and while Martin performed some of her job duties in several states, she is a Texas resident, and she conducted the majority of her work from her home in El Paso, Texas.  *See* Verified Compl. 3; Answer 3; Pl.'s Ex. 1.  In contrast, Pennsylvania does not have any significant contacts with the parties or the transaction other than the fact that McKissock was formerly headquartered there.  Given the lack of any significant connection between Pennsylvania and the parties or transaction, and because Martin is a Texas resident, the Court finds that the § 188 factors weigh in favor of Texas.  *See DeSantis*, 793 S.W.2d at 679 ("[T]he gist of the agreement in this case was the performance of personal services in Texas.  As a rule, that factor alone is conclusive in determining what state's law is to apply.") (similarly holding that Texas law had a more significant relationship than Florida where Florida

employer hired Texas employee to manage Texas office even though negotiations took place in Florida and employer supervised employee from Florida); *see also Cardoni*, 805 F.3d at 573 (holding that Oklahoma law had a more significant relationship than Texas where performance took place in Oklahoma). Consequently, absent the choice-of-law provision, Texas law would apply.

ii. Materially Greater Interest

"Texas has a materially greater interest than does [Pennsylvania] in determining whether the [Non-Compete] [A]greement in this case is enforceable." *See DeSantis*, 793 S.W.2d at 679 9 (similarly finding that Texas had a materially greater interest in enforcing a noncompete agreement executed by a Texas resident than did Florida, where the employer was headquartered). Texas is directly interested in Martin as an employee in Texas, in McKissock as a national employer doing business in this state, and in consumers of the services McKissock furnishes in Texas and performed by Martin. *See id.* However, both Texas and Pennsylvania share "a general interest in protecting justifiable expectations of entities doing business in several states." *See id.* Yet, Pennsylvania's direct interest in enforcement of the Non-

Compete Agreement in this case is "limited to protecting a national business [formerly] headquarted in that state." *See id.*

Thus, the Court finds that Texas has a materially greater interest in the enforcement of the Non-Compete Agreement than does Pennsylvania. *Cf. Cardoni*, 805 F.3d at 584–85 (finding that Oklahoma had a materially greater interest than did Texas, where the employer was headquartered, in determining enforceability of non-compete agreement where employees were mainly residents of Oklahoma and mainly performed the contract in Oklahoma).

### iii. Contrary to Fundamental Policy

"The final step in the analysis is determining whether the application of [Pennsylvania] law would be contrary to a fundamental policy of Texas." *See Drennen*, 452 S.W.3d at 327 (citing Restatement (Second) of Conflict of Laws § 187(2)(b)). The Restatement does not provide a general definition for "fundamental policy," but the Texas Supreme Court has found that "whatever its parameters, enforcement of noncompetition agreements falls well within them." *DeSantis*, 793 S.W.2d at 680. The Texas Supreme Court held that determining "[w]hat noncompetition agreements are reasonable restraints upon

employees in this state . . . is a matter of public policy" and that this "policy is fundamental in that it ensures a uniform rule for enforcement of noncompetition agreements in this state." *Id.* The Texas Supreme Court reasoned that "[a]bsent such a policy, agreements involving residents of other states would be controlled by the law and policy of those states." *Id.* Therefore, "[a]n employee of one out-of-state employer might take a competing job and escape enforcement of a covenant not to compete because of the law of another state." *Id.* "The resulting disruption of orderly employer-employee relations, as well as competition in the marketplace, would be unacceptable." *Id.* Consequently, the Texas Supreme Court ultimately held that "to apply the law of another state to determine the enforceability of [a noncompetition] agreement in the circumstances of a case like this would be contrary to [a fundamental Texas] policy." *Id.* at 681.

Therefore, the Court finds that the application of Pennsylvania law to the Non-Compete Agreement would be contrary to a fundamental Texas state policy. *See id.*

Because (1) Texas has a more significant relationship with the parties and transaction than does Pennsylvania and Texas law would

apply absent the parties' choice-of-law provision; (2) Texas has a materially greater interest in the enforceability of the Non-Compete Agreement; and (3) applying Pennsylvania law to the Non-Compete agreement would be contrary to a fundamental Texas state policy, the Court will apply Texas law.

> 2. Enforceability of the Non-Compete Agreement pursuant to Texas Law

The Texas Business and Commerce Code provides that "[e]very contract . . . in restraint of trade or commerce is unlawful." Tex. Bus. & Com. Code § 15.05. "An agreement not to compete is in restraint of trade and therefore unenforceable . . . unless it is reasonable." *DeSantis,* 793 S.W.2d at 681. Namely, the Texas Business and Commerce Code provides the following criteria regarding the enforceability of non-compete agreements:

> Notwithstanding Section 15.05 of this code . . . a covenant not to compete is enforceable if it is [1] ancillary to or part of an otherwise enforceable agreement at the time the agreement is made [2] to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code § 15.50(a).

18

*Section 15.50(a)'s First Prong: Ancillary to or Part of An Otherwise Enforceable Agreement*

"The requirement of an 'otherwise enforceable agreement' is satisfied when the covenant is ancillary to or part of an agreement which contains mutual, nonillusory promises." *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 584 (5th Cir. 2015) (citing *Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011)) (applying Texas law). "A contract for at-will employment, standing alone, does not satisfy the requirement of an 'otherwise enforceable agreement' because the promise of continued employment in an at-will contract is illusory— neither the employer or employee is bound in any way." *Id.* (citing *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 849 (Tex. 2009)).

Here, because Martin was an at-will employee, the employment agreement *itself* does not constitute an "otherwise enforceable agreement." *See id.* Yet, in *Alex Sheshunoff Management Services LP v. Johnson*, the Texas Supreme Court held that "a unilateral contract formed when the employer performs a promise that was illusory when made can satisfy the requirements of [§ 15.50(a)]." 209 S.W.3d 644, 651 (Tex. 2006); *see also Neurodiagnostic Tex, LLC v. Pierce*, No. 12-14-

00254-CV, 2016 WL 6426830, at *5 (Tex. App.—Tyler Oct. 31, 2016) (withdrawing and superseding opinion on denial of rehearing) ("When an employer makes an illusory promise of consideration and later performs in accord with the promise, the consideration is no longer illusory."). The Texas Supreme Court further specified that where an employer expressly promises to provide an employee with confidential information, the employee expressly promises not to disclose the information, and the employer eventually follows through on its promise, the agreement is one that is otherwise enforceable and ancillary to the non-compete agreement involved. *Sheshunoff*, 209 S.W.3d at 651.

In *Fielding*, the Texas Supreme Court expounded on this line of reasoning and held that even an employee's promise not to disclose confidential information in the absence of an express promise by the employer to furnish such information, is sufficient to render this agreement enforceable and ancillary to a non-compete agreement:

> [The employee] expressly promised in this employment agreement to 'not disclose or use at any time . . . any secret or confidential information or knowledge obtained by [him] while employed . . . . This promise, though, meant nothing without a correlative commitment by [the employer]. . . . The

> . . . evidence shows conclusively that [the employer] impliedly promised to supply confidential information to [the employee].

*Fielding*, 289 S.W.3d at 851. The Texas Supreme Court further noted that the employer's implied promise to provide the employee with confidential information was illusory because the employer "had the option of terminating [his] employment prior to giving him access to confidential information." *Id.* at 852. The *Fielding* court nevertheless held that "the parties still formed an 'otherwise enforceable agreement'" when the employer "performed its illusory promise by actually providing the confidential information." *Id.*

Ultimately, the Texas Supreme Court has admonished that "[t]he enforceability of the covenant should not be decided on 'overly technical disputes' of defining whether the covenant is ancillary to an agreement." *Marsh*, 354 S.W.3d at 777. Instead, the Texas Supreme Court has determined that the core inquiry is that of the second major factor in § 15.50(a)—whether the restrictions are reasonable and do not impose a greater restraint than necessary to protect the goodwill or other business interest of the promisee. Moreover, the Texas Supreme Court has explained that

> [c]oncerns that have driven disputes over whether a
> covenant is ancillary to any otherwise enforceable
> agreement—such as the amount of information an
> employee has received, its importance, its true degree of
> confidentiality, and the time period over which it is
> received—are better addressed in determining whether
> and to what extent a restraint on competition is justified.

*Sheshunoff*, 209 S.W.3d at 655.

On the one hand, Martin expressly promised, in the

Confidentiality Agreement, not to "disclose or divulge . . . any trade

secrets, confidential information, or any other proprietary data of

[McKissock]." Confidentiality Agreement 1. On the other hand,

McKissock does not expressly promise to provide Martin with

confidential information in the Confidentiality Agreement. Rather, the

Confidentiality Agreement states that certain trade secrets "*may* be

disclosed to [Martin]" during her employment. *Id.* (emphasis added).

Consequently, McKissock implied such a promise to divulge confidential

information. *See Fielding*, 289 S.W.3d at 851–52. This implied promise

was illusory unless McKissock eventually did perform by providing

McKissock with confidential information. *See id.*

Martin argues that McKissock never provided her with any

confidential information. Resp. 10. She asserts that all of the

information that McKissock provided to her was publicly available. *Id.* at 9–10; Am. Tr. 62–64. Despite Martin's present contention, however, McKissock introduced an email that Martin wrote to one of McKissock's attorneys, where she stated that before she shipped the company laptop computer back to McKissock "[a]ll *proprietary information* was removed from the hard drive lest the shipment fall into the wrong hands and *confidential information* be made available to unauthorized sources." Pl.'s Ex. 27 at 2 (emphasis added). To be sure, this email undercuts Martin's present contention.

Additionally, McKissock subsequently filed its "Supplement to its Motion for Injunctive Relief and Motion to File Exhibits Under Seal" (ECF No. 20) [hereinafter "Supplement"], wherein it attached four excel spreadsheets containing various information retrieved from the Dell laptop computer that McKissock had provided to Martin and which Martin had reformatted.[5] Specifically, the spreadsheets contained

---

[5] As noted above, McKissock filed its Supplement under seal. Suppl. 5–6. In its Supplement, counsel for McKissock also informed the Court that Martin was not opposed to the filing of the documents attached to the Supplement under seal but "reserved the right to respond." *Id.* at 6. Consequently, the Court granted McKissock's request to file the attached documents under seal. *See generally* Suppl. (filed under seal).

pricing and revenue information for webinar courses, course dropout rates, an extensive client list, project names and information for completed and anticipated courses. *See generally* Suppl. McKissock asserts that the information contained in the excel spreadsheets is confidential and requested that it be filed under seal. *Id.* Martin maintains that the information provided in the spreadsheets is not confidential and is publicly available. Resp. Suppl. 2.

In accordance with the Texas Supreme Court's instruction that courts should not engage in overly technical disputes when deciding whether non-compete agreements are ancillary to an agreement, the Court finds that the Non-Compete Agreement is ancillary to the

---

In her "Response to Plaintiff's Evidentiary Supplement to Its Motion for Injunctive Relief" (ECF No. 22) [hereinafter "Response to Supplement"], filed on September 9, 2016, Martin requests that the documents be unsealed. Resp. Suppl. 2. Therein, she informs the Court that she "did not initially object to the filing of the four spreadsheets under seal," because her agreement to the filing of the documents under seal was "made 'in the blind' and as a matter of courtesy before she had an opportunity [sic] review the documents being filed under seal." *Id.* The Court will deny Martin's request to unseal the documents. First, Martin was free to object to the filing of the documents under seal when McKissock first presented the request to the Court notwithstanding Martin's decision not to do so. Second, the Court has reviewed the documents and determined that they contain sensitive and confidential information related to McKissock's business interests. Thus, the Court will not unseal the documents.

Confidentiality Agreement. *See Marsh*, 354 S.W.3d at 777. The Court concludes that McKissock provided Martin with confidential information—as evidenced by Martin's own admission—and she promised not to divulge such information. Pl.'s Ex. 27 at 2. Therefore, the first prong of Section 15.50(a) is satisfied.

b. *Section 15.50(a)'s Second Prong: Reasonableness of Restrictions*

Section 15.50(a)'s second prong requires the Court to determine whether the restrictions contained in the Non-Compete Agreement are reasonable and do not impose a greater restraint than is necessary to protect McKissock's goodwill or other business interest. Namely, the Non-Compete Agreement's geographic restrictions, the time it is in effect, and the scope of activity to be prohibited must all be reasonable. § 15.50(a). "The hallmark of enforcement is whether or not the covenant is reasonable." *Marsh*, 354 S.W.3d at 775.

The crux of Martin's argument is that "McKissock is unable to demonstrate that it has a legitimate protectable interest at stake." Resp. 12. She argues that she "received no access to trade secrets and no specialized training to give rise to a 'protectable interest.'" *Id.* Martin asserts that "[a]ll of the key information about the training

courses, including the title and date of the courses, the price of the course, and the identity of the customers, is a public record." *Id.* Ultimately, Martin alleges that "all [she] acquired from her time with McKissock was general knowledge about how to teach Appraisal [Continuing Education] courses and write Appraisal [Continuing Education] papers." *Id.*

McKissock asserts that the information that it provided in its Supplement "fall[s] exactly within the definition of trade secrets and express terms of the Non-Disclosure Agreement (including 'Customer lists, merchandising systems or plans')." Pl.'s Reply to Def.'s Resp. to Suppl. 5, Oct. 4, 2016, ECF No. 25 [hereinafter "Reply to Supplement"]. It argues that "[s]uch information would give Cannon or any other competitor a significant, and unfair, advantage." *Id.*

"Business goodwill,[6] confidential or proprietary information, trade secrets, customer information, and specialized training are examples of

---

[6] Goodwill is defined as:

> the advantage or benefits which is acquired by an establishment beyond the mere value of the capital stock, funds or property employed therein, in consequence of the general public patronage and encouragement which it

interests that can be, in appropriate circumstances, worthy of protection by a covenant not to compete." *Neurodiagnostic Tex, LLC*, 2016 WL 6426830, at *6 (citing *Marsh*, 354 S.W.3d at 777; *Sheshunoff*, 209 S.W.3d at 651; *Lazer Spot, Inc. v. Hiring Partners*, 387 S.W.3d 40, 46 (Tex. App.–Texarkana 2012, pet. denied)).

Accordingly, the Court finds that McKissock does have a protectable interest at stake—its goodwill and the confidential, proprietary information that Martin acquired when she was McKissock's employee, including revenue information, customer ratings, and ideas for future projects. While Martin argues that the information McKissock provided to her is all publicly available and outdated, the Court finds that not all of it is. In fact, most of the information contained in the Supplement is confidential. Notably, McKissock argues, and the Court agrees, that "it is disingenuous for

---

receives from constant and habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

*Marsh*, 354 S.W.3d at 777–78 (internal citation and quotations omitted).

Martin to reformat the hard drive on the laptop computer she used for her work for McKissock and then claim, *after* she deletes all of McKissock's data and information, that McKissock cannot show the confidential information she had on her laptop." *See* Reply Suppl. 4. Furthermore, McKissock also introduced evidence demonstrating that Martin contributed significantly to McKissock's goodwill because her teaching scores and customer ratings were "at the top of McKissock's chart." Pl.'s Ex. 21 at 2. Another email from Johnson to Martin is particularly probative of the goodwill that Martin had developed while at McKissock as well: "A reviewer from [W]ells [Fargo] was at our first class . . . . He said he loves your classes. . . . He said he would get 20 [W]ells [Fargo] people if you were teaching." Pl.'s Ex. 11. Consequently, the Court finds that McKissock does have a protectable interest at stake.

However, the Court also finds that, as currently written, the Non-Compete Agreement is unduly broad and places a restraint on Martin that is more than necessary to protect McKissock's interests. Namely, the Non-Compete Agreement does not limit the scope of activity prohibited in any manner: "[Martin agrees that she will not] be

employed or retained by, participate in or be connected *in any manner* with any business or practice which is in competition with [McKissock]." Non-Compete Agreement 1 (emphasis added). Therefore, the Non-Compete Agreement, as currently written, is unreasonable. *See Wright v. Sport Supply Grp.*, 137 S.W.3d 289, 298 (Tex. App.—Beaumont 2004, no pet.) ("A restrictive covenant is unreasonable unless it bears some relation to the activities of the employee."); *see also McNeilus Cos. Inc. v. Sams*, 971 S.W.2d 507, 511 (Tex. App.—Dallas 1997, no writ) ("[W]e conclude that the trial court could have reasonably found that prohibiting [the defendant] from working *in any capacity* for a . . . competitor [of the plaintiff] was a restraint too broad in scope."); *APRM Inc. v. Hartnett*, No. 01-00831-CV, 2002 WL 1435995, at *5 (Tex. App.— Houston [1st Dist.] July 3, 2002, no pet.) ("The covenant [not to compete's] restraint is not limited to the capacity in which [the defendant] worked for [the plaintiff]. Thus, the restraint is overbroad and is unreasonable."). Therefore, the Court will reform the agreement to prohibit Martin from providing services to a competitor that are similar to those that she provided to McKissock (i.e., developing and teaching insurance appraisal courses). *See* Tex. Bus. & Com. Code §

15.51(c)("If the covenant is found to be ancillary to or part of an otherwise enforceable agreement but contains limitations as to . . . scope of activity to be restrained that are not reasonable . . . the court shall reform the covenant to the extent necessary to cause the limitations contained [therein] . . . to be reasonable . . . .").

Martin also argues that the Non-Compete Agreement is "unreasonable in terms of its time and scope" because "a nation-wide restriction for a two-year period is overbearing and unreasonable, and should therefore not be enforced by the Court." Resp. 13. The Court concludes that after reforming the scope of activity prohibited, the two-year, nationwide restriction is reasonable, given the record before the Court.

"The breadth of enforcement of territorial restraints in covenants not to compete depends upon the nature and extent of the employer's business and the degree of the employee's involvement." *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001). "A reasonable geographic restriction is generally considered to be the territory in which the employee worked for the employer." *TransPerfect Translations Inc. v. Leslie*, 594 F. Supp. 2d

742, 754 (S.D. Tex. 2009) (citing *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex. App.—Dallas 1992, no writ)). "Texas courts have upheld nationwide geographic limitations in non-compete agreements when it has been clearly established that the business is national in character." *Vais Arms Inc. v. Vais*, 383 F.3d 287, 296 n.20 (5th Cir. 2004);[7] *see also Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 567 (S.D. Tex. 2014) ("Covenants with wide geographic areas have been upheld in Texas courts, especially when the area covered constitutes the employees actual sales or work territory. Even a worldwide non-competition agreement may be upheld under circumstances where determining the scope of the geographical area of former employment was difficult.") (collecting cases) (internal quotation marks and citations omitted).

---

[7] The Court notes that *Vais Arms Inc.* is somewhat distinguishable from the present case in that it involved a former owner/employee competing with the company he formed after selling it by forming another competitor company, despite signing a noncompetition agreement. 383 F.3d at 289. However, the Court finds that, notwithstanding these distinct facts, *Vais*'s reasoning that a nationwide geographic restriction is reasonable when a business is national in character is nevertheless informative. *See id.*

In the present case, Martin herself admitted the national scope of McKissock's services: "On one side of this case in the role of plaintiff stands a large national training provider business . . . ." Resp. 5. During the hearing, Martin also testified to the same effect:

> Q.    By the time -- prior to going to McKissock in 2011,
> was McKissock a large provider -- national training provider o]
> were they a small national training provider?
>      A.    No.    They were a very large provider.
>      Q.    Were they one of the largest providers in the United
> States?
>      A.    Yes, sir.
>      . . . .
>      Q.    (BY MR. BLUMENFELD)    Were they an industry leader?
>      A.    Yes, sir.

Am. Tr. 52.

Additionally, Martin confirmed that she taught online webinar courses as a McKissock employee, and clients from across the nation had access to Martin's webinar courses. *Id.* at 55–57. Although the record is unclear regarding the exact locations where Martin taught live courses while she was a salaried employee of McKissock, there is

evidence that she taught in at least twenty-five states while she was employed as a contractor.[8] Def.'s Exs. 26–28.[9]

Consequently, the court finds that the nationwide restriction in the Non-Compete Agreement is reasonable, given McKissock's national customer base, given the fact that Martin taught online courses available to and accessed by McKissock's national client base, and given Martin's position upper-level position as Senior Appraisal Instructor. Verified Compl. 7 ("Martin was included in meetings of McKissock management regarding McKissock business operations, customer referral sources, strategies, plans, financial information, and other confidential and trade secret information of McKissock."); *see Heidt*, 998 F. Supp. 2d at 567–68 ("[The] Non-Competition Agreement is likely to be found reasonable and enforceable. [The defendant] was a high-level sales manager at [the plaintiff company] with direct sales

---

[8] Martin taught in the following states while she was a contractor: Alabama, Arizona, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Michigan, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, Ohio, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, and Wisconsin.

[9] Defendant's Exhibits 1–32 were never filed; however, the court is in possession of these exhibits, which were presented during the hearing.

responsibilities for large portions of the United States . . . . and with confidential information regarding its clients and sales worldwide.").

Regarding the duration of the Non-Compete Agreement, the Court also finds that a two-year restriction is reasonable. *See Brink's Inc. v. Patrick*, No. 3:14-CV-775-B, 2014 WL 2931824, at *5 (N.D. Tex. June 27, 2014) ("Texas Courts have generally upheld non-compete periods ranging from two to five years as reasonable.") (collecting cases).

Hence, the Court finds that the Non-Compete Agreement, as reformed, is likely enforceable and McKissock has demonstrated a substantial likelihood of prevailing on the merits. Pending dispositive motions or a trial on the merits, the Court will reform the Non-Compete Agreement to read as follows:

> Martin shall not be employed for a competitor of McKissock, as a qualifying education, or continuing education, instructor for insurance appraisers—including developing the material or ideas for courses, or being employed in a supervisory or management position in the insurance appraisal qualifying education field for the two years following the last date of her employment at McKissock.

The Court further specifies that this is not an industry-wide exclusion, as Martin may still work in the insurance industry generally and even the insurance appraisal field specifically. *See Merritt Hawkins &*

*Assocs., LLC, v. Gresham*, 79 F. Supp. 3d 625, 641 (N.D. Tex. 2015) ("[A] covenant 'that contains an industry-wide exclusion from subsequent employment is unenforceable.'" (quoting *Wright*, 137 S.W.3d at 298)). She is only prohibited from participating in the insurance appraisers qualifying or continuing education field as a course developer or instructor.

## B. Irreparable Injury

A preliminary injunction will only issue upon the showing of irreparable injury. *See Hood*, 822 F.3d at 220.

> McKissock argues that breach of the Non-Compete Agreement has
>
> caused and/or will cause (if not enjoined) substantial and irreparable harm to McKissock that cannot be remedied at law, including but not limited to, harm to McKissock's business operations and competitiveness in the market, substantial loss of customer goodwill and business referral sources, and loss of competitive use and value of McKissock's confidential information, trade secrets and work product.

Verified Compl. 9.

By contrast, Martin argues that McKissock "a large national training provider business . . . has likely not suffered a single penny of lost revenue" as a result of Martin being employed by Cannon "a small Arizona competitor." Resp. 5. Martin further asserts that she "would

be surprised if McKissock . . . could point to a single lost customer as a result of Martin's decision to write for another training provider." *Id.*

To demonstrate threat of an irreparable injury, a plaintiff seeking injunctive relief must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). "In Texas, injury resulting from the breach of non-compete is the epitome of irreparable injury, so enforcement appears to be the rule rather than the exception." *Sirius Comput. Sols. Inc. v. Sparks*, 138 F. Supp. 3d 821, 841 (W.D. Tex. 2015) (citing *Cardinal Health Staffing Network Inc. v. Bowen*, 106 S.W.3d 230, 236 (Tex. App.—Hous. [14th Dist.] 2003, no pet.)).

Moreover,

> [t]he use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm. Where there is a high degree of similarity between the employee's former and future employer, it becomes likely, although not certain that the former's confidential information will be used and disclosed in the course of his work.

*Transperfect*, 594 F. Supp. 2d at 757 (citing *PepsiCo Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995)).

The Court concludes that McKissock has sufficiently demonstrated irreparable injury because Martin received confidential information while at McKissock, began employment with Cannon—a competitor of McKissock—and seeks to continue working for Cannon in violation of the Non-Compete Agreement. Martin would likely have difficulty not utilizing the confidential information she acquired while at McKissock during the course of her employment for a competitor such as Cannon. *See Heidt*, 998 F. Supp. 2d at 569 ("An employee who possess trade secrets belonging to a former employer and accepts employment with one of its competitors, even if acting in good faith, will have difficulty preventing his knowledge from infiltrating his work. Thus, the courts have recognized the need for injunctive relief in these situations."); *see also TransPerfect*, 594 F. Supp. 2d at 757 ("[W]here [an] employer has demonstrated it will be difficult for [an] employee to compartmentalize his knowledge, it is likely that employee's knowledge gained at the former employer will allow him an unfair advantage in making strategic decisions at his new employer.").

## C.  Balancing of Harms

"The third factor requires the plaintiff to establish that his irreparable harm is greater than the harm that the preliminary injunction will cause the defendant." *Sirius Comput. Sols. Inc.*, 138 F. Supp. 3d at 842 (internal quotation marks and citation omitted).

Here, Martin claims that on one side of the case is plaintiff, a large national training provider, that has likely not lost any revenue as a result of Martin's departure to work for a competitor. *See* Resp. 5. "On the other side," Martin claims, "stands a 66-year old recent widow with no job, little savings, and no easy way to support her family other than to work writing curriculum or training the Appraisal [Continuing Education] industry." *Id.* Martin asserts that she "plans to [sic] for unemployment if she cannot earn an income in the career she has worked in for the past 20 years." *Id.* Martin further alleges that "[s]he will literally become a ward of the state and need welfare benefits for the first time in her life if she is enjoined form working in this case." *Id.* Martin concludes that "[t]hese equities weigh so strongly in Martin's favor that any enforcement of the noncompetition provision in this case would be hard to comprehend in a decent and caring world." *Id.*

McKissock avers that Martin's breach of the Non-Compete agreement will cause, if not enjoined, "harm to McKissock's business operations and competitiveness in the market, substantial loss of customer goodwill and business referral sources, and loss of competitive use and value of McKissock's confidential information, trade-secrets and work product." Verified Compl. 9.

Although Martin claims that she will have to file for unemployment and will not be able to earn a living if the injunction is issued, the Court is not convinced that this will necessarily be the case. Martin admits that she was previously a "fully-trained and experienced real estate appraiser" from 1985 to 2002. Resp. 3. Martin further concedes that she "could try to return to work as an appraiser" but asserts, "it would take time to build up a practice, especially with no recent contacts and just a few weeks before her 67th birthday." *Id.* at 5. During the preliminary injunction hearing, Martin clarified that she is a commercial appraiser. Am. Tr. 124. She also testified that there are currently no opportunities for commercial appraisers in El Paso, where she desires to work, but she only received this speculative information from other commercial appraisers she knows. *Id.* at 124–25. At the

time of the hearing, Martin had not looked into or attempted to enter the insurance appraisal industry, as an appraiser, herself. *Id.* Furthermore, during the hearing, Martin testified that she would be able to do appraisal work if she could find a client. *Id.* at 125.

The Court concludes that the irreparable harm that McKissock stands to suffer is greater than the harm to Martin. Contrary to her current position, Martin had previously boasted about the ability to grow Cannon to be a "serious threat" to McKissock with her help. Pl.'s Ex. 10.

### D. Public Interest

Finally, the fourth factor requires that granting the preliminary injunction will not disserve the public interest. *Hood*, 822 F.3d at 220.

The Court finds that issuing a preliminary injunction in this case will not disserve the public interest. To the contrary, "it is in the public interest to uphold contracts and to enforce a remedy that is provided for by Texas law." *Heidt*, 998 F. Supp. 2d at 571.

Martin signed the Non-Compete Agreement after reading it and understanding it; Martin began discussing competing with McKissock while she was still employed there; and Martin retained a company

laptop that McKissock provided to her, which contained confidential company information, while she began working for a competitor company. Moreover, Martin is not precluded from being an insurance appraiser—the field in which she is trained and the field in which she was employed for nearly twenty years. She is only prohibited from teaching and writing insurance appraisal courses in the continuing education field for the limited period of two years.

"Further, Texas has clarified the public interest through its non-compete statute, and under the statute, enforcing reasonable non-compete agreements is within the public interest." *TransPerfect*, 594 F. Supp. 2d at 758.

Consequently, the Court concludes that McKissock has successfully demonstrated all four factors required for issuing a preliminary injunction in this case. It has demonstrated that it would be successful in enforcing the Non-Compete Agreement and that Martin has breached and seeks to continue to breach the Non-Compete Agreement; it has shown that it would suffer irreparable injury if the Non-Compete Agreement is not enforced; the balance of the harms

weighs in its favor; and it would not disserve the public interest to enforce the Non-Compete Agreement.

## IV. CONCLUSION

The foregoing, constitutes the Court's findings of fact and conclusions of law.

Accordingly, **IT IS ORDERED** that Martin is enjoined from being employed for any competitor of McKissock in the United States, as a qualifying education, or continuing education, instructor for insurance appraisers—including developing the material or ideas for courses, or being employed in a supervisory or management position in the insurance appraisal qualifying education field until June 10, 2018.

SIGNED this _10th_ day of **November, 2016.**

PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE